## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ALEXIS CLANTON, | ) | |
| | ) | No. 12 CV 2455 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | April 15, 2013 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Plaintiff Alexis Clanton ("Clanton") applied for Supplemental Security Income ("SSI") under § 1614(a)(3)(A) of the Social Security Act. The Social Security Administration ("Commissioner") denied her application for benefits. Clanton now challenges the denial and asks the court to either reverse this decision or remand the case for further proceedings. For the following reasons, Clanton's motion is granted to the extent it seeks a remand, and the Commissioner's cross-motion for summary judgment is denied:

### Procedural History

Clanton applied for SSI on March 27, 2009, claiming that her disability began on June 1, 1994, as a result of asthma, obesity, and learning and cognitive problems. (Administrative Record ("A.R.") 212.) The Commissioner denied Clanton's claim on August 12, 2009, (id. at 129), and then again on reconsideration on October 8, 2009, (id. at 138). Clanton requested a hearing before an Administrative Law Judge

("ALJ"), and this request was granted on July 27, 2010. (Id. at 151.) On September 16, 2010, the ALJ conducted an initial hearing and then held the record open to allow Clanton time to submit missing medical records and to arrange for psychological and intellectual quotient ("IQ") testing. (Id. at 105, 113.) The ALJ conducted a second hearing on April 15, 2011, after which he concluded that Clanton is not disabled as defined by the Social Security Act. (Id. at 14, 123.) The Appeals Council denied Clanton's request for review on February 17, 2012, (id. at 1), thereby rendering the ALJ's decision the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Clanton initiated this civil action for judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of this court, *see* 28 U.S.C. § 636(c).

## Background

Clanton, who currently is 26 years old, has a long history of asthma and obesity dating back to her early childhood. In fact, as a child Clanton received disability benefits for these same medical problems; however, her benefits were discontinued when she reached adulthood. Clanton has one young daughter. She does not have a driver's license and has never held a job. Although she graduated from high school, she reads at a sixth grade level and has an IQ of 79. Clanton claims that she is unable to work on account of her medical problems. At the two hearings before the ALJ, Clanton presented both documentary and testimonial evidence in support of her claim.

A.    **Medical Evidence**

The applicable medical record in this case begins on September 27, 2008, when Clanton arrived at St. Bernard Hospital complaining of shortness of breath.   (A.R. 544-45.)    The emergency room notes from this visit indicate that Clanton's breathing was "labored" and that she had audible "wheezes."   (Id. at 551.)   She was given Albuterol (a bronchodilator that increases airflow to the lungs) and Prednisone (a corticosteroid used to treat inflammatory diseases)—both of which are very commonly used to treat asthma.   (Id. at 546.)   She was discharged two hours after her arrival with a diagnosis of "asthma exacerbation."   (Id. at 552.)

Two days later, Clanton arrived at NorthShore University Hospital's emergency room and was admitted there until the following day.   (Id. at 561.) Clanton's chief complaint was wheezing and shortness of breath.   (Id. at 573.) Notes from this hospital stay reflect that Clanton had been at St. Bernard Hospital two days prior, where she received two nebulizer treatments and was given a prescription for Prednisone.   (Id.)   However, she never filled the prescription and her shortness of breath increased over the subsequent two days.   (Id.)   During this hospital stay, she was noted to have "wheezing throughout all lung fields" and "[s]ignificant effort of breathing evidenced by use of accessory muscle use and difficulty talking."   (Id. at 578.)   The stated reason for her admission to the hospital was "[u]nspecified [a]sthma, with [e]xacerbation."   (Id. at 564.)   Throughout her stay she was administered Albuterol and Prednisone.   (Id. at 565-67.)

On March 11, 2009, Clanton arrived at St. Francis Hospital's emergency room complaining of shortness of breath, wheezing, cough, and body aches without relief from her nebulizer or inhaler. (Id. at 529-30.) The physician notes from this visit indicate the presence of wheezing and mildly diminished bilateral breath sounds. (Id. at 534.) Clanton was administered Albuterol, Prednisone, and Zithromax and was given a diagnosis of an upper respiratory infection with asthma exacerbation. (Id. at 535-36.) She was then discharged less than two hours after she arrived. (Id. at 539.)

Clanton was back at the NorthShore Hospital emergency room the next day. (Id. at 543.) Her diagnosis was listed as "unspecified asthma, with exacerbation," and she was prescribed Prednisone. (Id.) The administrative record includes only one page from this hospital visit—the first page of her discharge instructions—and it is unclear from this single page how long Clanton stayed at the emergency room.

Three days later, Clanton returned to NorthShore Hospital by ambulance and was admitted until the following day. (Id. at 316.) She complained of coughing blood, vomiting, and of having an asthma attack for which her inhalers provided minimal improvement. (Id. at 320-21.) She maintained that she had been unable to keep her steroid medications in her system on account of vomiting. (Id. at 321.) The medical staff noted that she had diffuse wheezes throughout her lungs and that they administered Albuterol and Prednisone in response. (Id. at 322.) One of the examining physicians noted that although Clanton reported being a non-smoker, "she smells like cigarette smoke." (Id. at 327.) The medical notes also remark that

4

"[e]xposure to tobacco smoke in [the] home is a chronic problem." (Id. at 318.) Other records from the visit provide a diagnosis of pneumonia and asthma. (Id. at 330.) The discharge instructions advise her not to smoke. (Id. at 339.)

The following month, on April 15, 2009, Clanton arrived at the emergency room of St. Francis Hospital complaining of shortness of breath not relieved by her inhaler. (Id. at 516, 520.) Medical personnel administered Albuterol for asthma exacerbation and antibiotics for pneumonia. (Id. at 517.) She was noted to be in "mild respiratory distress with slight audible wheeze." (Id. at 520.) She was discharged two and a half hours later. (Id. at 523.)

Two days later, on April 17, 2009, Clanton went to the emergency room of NorthShore Hospital complaining of difficulty breathing and was admitted there for four days. (Id. at 355.) The reasons given for her admission were "[u]nspecified asthma with [e]xacerbation" and "[p]neumonia." (Id. at 359.) She was administered Prednisone and Albuterol. (Id. at 361.) A chest x-ray showed "worsening of the [right lower lobe] infiltrate" indicating Clanton "[l]ikely . . . has pneumonia resulting in asthma exacerbation though her lung exam is not typical of asthma." (Id. at 378.)

Clanton had two hospital visits in 2010. The first was a four-day stay in May at NorthShore Hospital. (Id. at 598.) Upon arrival at NorthShore, Clanton stated that she had used her inhaler four times in a row, without relief, before coming to the emergency room. (Id. at 608.) She was noted to be in "moderate to severe respiratory distress" with "diffuse expiratory wheezes" and was admitted to the ICU.

(Id. at 605, 608.)  The medical records reflect statements by Clanton to the effect that her asthma exacerbation was the result of her having lost her inhaler for the three days preceding her hospitalization.  (Id. at 615.)  She also admitted that she used marijuana a month earlier.  (Id.)  A toxicology screen done during the hospital stay was positive for marijuana.  (Id. at 624, 626.)  A chest x-ray the day after her admission showed a "hazy opacity in both lung bases."  (Id. at 620.)

The second hospital visit occurred in November and involved an hour and a half stay at St. Francis Hospital's emergency room following complaints of cough and shortness of breath.  (Id. at 704.)  Clanton was diagnosed with asthma exacerbation and discharged after receiving a prescription for Prednisone.  (Id. at 699, 703-05.) She then left the prescription behind in the emergency room.  (Id. at 703.)

In 2011 Clanton had two more hospital visits:  one in February and one in June.  In February, Clanton arrived at NorthShore's emergency room complaining of wheezing and shortness of breath that did not resolve with home Albuterol use. (Id. at 726, 741.)  She was kept overnight and discharged the next day following diagnosis and treatment for "moderately persistent asthma exacerbation."  (Id. at 728.)  The June visit involved a similar presentation:  shortness of breath and wheezing, for which home Albuterol treatments did not help.  (Id. at 779.)  She was diagnosed with asthma exacerbation.  (Id. at 774.)

The record also includes two "functional capacity" questionnaires.   The first is a Physical Residual Functional Capacity Assessment, dated August 11, 2009, by a Social Security Administration consultant, Dr. Charles Kenney.  (Id. at 407-14.)

6

Dr. Kenney's questionnaire lists asthma as the primary diagnosis and cites a number of postural and environmental limitations: postural limitations allowing for "occasional" climbing of ramps, stairs, ladders, ropes, and/or scaffolds, and environmental limitations requiring Clanton to avoid concentrated exposure to fumes, odors, dusts, gases, and other pulmonary irritants. (Id. at 411.) Dr. Kenney did not identify any exertional, manipulative, visual, or communicative limitations. (Id. at 408-11.) Under "Additional Comments," Dr. Kenney remarked on concerns about Clanton's credibility: "[i]t is noted in 3/09 when seen for episode of pneumonia the [emergency room doctor] at Evanston doubted claimant's story she did not smoke cigarettes, as she smelled of cigarette smoke." (Id. at 414.) Dr. Kenney also remarked that "the objective [medical evidence] overall does not support [the] presence of a physical condition that would meet or equal any of the adulthood physical listings of impairments." (Id.)

The second is a "Pulmonary Residual Functional Capacity Questionnaire" completed by Dr. Rahul Wadke in December 2010. (Id. at 717.) Dr. Wadke, an internal medicine doctor at NorthShore Hospital, examined Clanton once in August 2010 and diagnosed her with obesity and asthma. (Id.) He noted that Clanton has asthma attacks every three to four months, lasting three to five days at a time. (Id.) He believed that she is capable of a low-stress job, provided her asthma is not triggered, and noted that her experience of pain or other symptoms would interfere "occasionally" with her workday. (Id.) He noted that the side-effects from her medications include fatigue, stomach upset, and palpitations. (Id.) He stated that

her prognosis is "good." (Id.) He advised that she avoid all exposure to extreme cold, chemicals, fumes/odors/gases, solvents/cleaners, and soldering fluxes. (Id. at 720.) He advised that she also avoid concentrated exposure to extreme heat, high humidity, wetness, cigarette smoke, and perfumes. (Id.) He opined that he expected her to be absent about four days per month, and that she would need to take unscheduled breaks one to two times a day for about 15-30 minutes at a time. (Id. at 719-20.)

Finally, in September 2010, Dr. Daniel Ray, a pulmonologist affiliated with NorthShore Hospital, performed a pulmonary function test on Clanton. (Id. at 694.) The test revealed that Clanton has a borderline obstructive ventilatory defect of which there is "significant reversal of airway obstruction after administration of an inhaled bronchodilator." (Id. at 694.)

## B. The First ALJ Hearing

The ALJ conducted a hearing on September 16, 2010. The hearing began with an opening statement of sorts by Clanton's attorney during which he argued that Clanton's hospital admissions of record satisfy Listing 3.03B (requiring at least six asthma attacks within a 12-month period). (Id. at 56-57.) The ALJ then inquired of the medical expert, Dr. Julian Freeman, a board certified internist and neurologist, whether he agreed with this assessment. (Id. at 57.) Dr. Freeman stated that he "had trouble tracing how many of these hospital admissions were for asthma." (Id. at 58.) "I came up with only four," he continued, "but I may have—my concern is that I may have miscounted." (Id. at 62.) Slightly later in the hearing,

8

Dr. Freeman acknowledged that he found four visits legitimately to be for asthma: March 15 and March 16, 2009 (each of which potentially counts as two episodes based on the length of her stays). (Id. at 69.) Two other visits, he conceded, seemed like they might qualify, but he was unable to re-identify them at the hearing. (Id.) Dr. Freeman further opined that "the basic requirement for treatment for asthma is that asthma be present rather than it being an admission for shortness of breath." (Id. at 60.) He felt that "admissions for pneumonia without severe asthmatic reaction would not be considered treatment for asthma. It would be treatment for pneumonia, and this was the difficulty." (Id.)

The ALJ encouraged Clanton's attorney and Dr. Freeman to go back through the record in an attempt to discern which visits were in fact for asthma. They did so, and the conversation continued. Dr. Freeman distinguished between visits for pneumonia and visits for asthma, while Clanton's attorney disagreed with this distinction, arguing that "asthma can predispose someone to pneumonia," and further, that the hospital records state "pneumonia with asthma exacerbation." (Id. at 63.) Dr. Freeman specifically discounted the admissions in April 2009 as not being "asthma admissions" because "the records a majority of times indicate the absence of wheezing." (Id. at 67.) When Clanton's attorney pointed out that wheezing was, in fact, present during the hospital visit on April 15, 2009, Dr. Freeman changed his position and contended that it was the May 2009 visit in which wheezing was not present. He then nevertheless stood his ground as to the April 2009 visit, stating: "[although] there was a momentary manifestation of

9

asthma . . . the overall admission I still think doesn't count." (Id. at 71.) Dr. Freeman also testified as follows:

> The ones in March, there was some wheezing but it appeared to be a precipitant by pneumonia and differentiating how much of it is asthma and how much of it is pneumonia, it really appears to be almost exclusively a pneumonia-related condition but there might have been some worsening of the asthma due to that. In April that doesn't appear to have been the case. . . . The records that were submitted in the recent group, there is some interspersed wheezing but again it's difficult to confirm that asthma is the precipitant. However, the majority of what's in April of 2009, which is again in today's records, wheezing is absent so that the best I can say is the listing is not met or equaled by the asthmatic component . . . primarily because the parameter medically is the degree to which obstruction or breathing itself, the ability to get air into and out of the lungs is impaired is the parameter and for most of these visits that's not affected.

(Id. at 68.) Ultimately, the ALJ did not agree with Clanton's attorney's characterization of Clanton's condition as pneumonia resulting in an asthma exacerbation. (Id. at 64.) He agreed instead with Dr. Freeman's position that the hospitalizations at issue were not primarily asthma attacks, stating:

> When you have pneumonia obviously you're going to have to seek treatment from a doctor. That's a totally different issue. So we don't count those. We only count the true asthmatic emergencies that the person has and then there has to be six of those, so I've never—since I've been here we've never counted visits for pneumonia or flu or other things that people can be predisposed to have.

(Id.)

Clanton testified next. She testified that she is 5'1" tall and weighs 300 pounds. (Id. at 78.) She graduated from Evanston High School in 2006, although for some portion of high school she attended a specialized school on account of her learning deficits and problems interacting with peers. (Id. at 79, 90.) She is a

single mother to a young daughter and she lived with her daughter, mother, and sister at the time of the first hearing. (Id. at 79.) She has never had a driver's license and has never held a job. (Id. at 79-80.) She received SSI as a child but it was discontinued in 2008. (Id.) She treats her asthma on a daily basis with a number of medications including Advair, Claritin D, Flonase, Albuterol, and Symbicort. (Id. at 82.) If she is unable to obtain relief from her symptoms using her Albuterol inhaler, she uses her nebulizer. (Id.) She testified that she "probably" uses her nebulizer about three or four times a week. (Id. at 83.) She has trouble walking far or fast, is unable to lift or carry her daughter, is uncomfortable standing for long periods of time, and gets out of breath when climbing stairs. (Id. at 86-87.) She denies smoking, drinking excessively, or using drugs. (Id. at 87.) Her mother, however, does smoke. (Id. at 94.)

During the day, Clanton mostly cares for her daughter. (Id. at 91.) Clanton is unable to lift or carry her daughter, but she can walk to the park with her in a stroller, give her a bath, and feed and change her. (Id. at 86-87, 91.) Aside from cleaning some dishes, Clanton does not do any housework because it makes her feel tired, wheezy, or out of breath. (Id. at 86.) She does not watch a lot of television but when she does, she often falls asleep. (Id. at 91-92.) Clanton explained that seasonal changes or abrupt weather fluctuations trigger her asthma. (Id. at 94.) Her symptoms begin with a runny nose and other cold symptoms, followed by shortness of breath, at which time she uses her Albuterol inhaler. (Id.) She denied

any adverse reaction to her medications, but then stated that the steroids can cause her appetite to grow.   (Id. at 94, 95.)

Clanton's mother, Taunja Guillebeaux, also testified and described her daughter's condition as "real bad severe asthma" involving shortness of breath and wheezing.  (Id. at 102.)   She explained that when her daughter gets an asthma attack her eyes water, her nose runs, and her breath gets short.  (Id. at 104.) "When that starts, she starts taking her machine and putting the medicine into the machine to see if that's going to help.   A lot of times it doesn't help.   Sometimes she has to go to the hospital."  (Id. at 104-05.)   Guillebeaux admitted to smoking but denied that her daughter smokes.   (Id. at 102-03.)   She testified that Clanton sleeps a lot, that she sometimes has trouble sleeping at night, and that she falls asleep during the day.   (Id. at 104.)

The ALJ asked vocational expert ("VE") Jill Radke to assume the following hypothetical facts:   an individual of Clanton's age, education, and work experience who could do the "entire universe of work" with the exception that she lift no more than 10 pounds occasionally and 5 pounds frequently; that she stand and walk no more than two out of eight hours with a maximum standing period of 10 to 15 minutes; that she sit six out of eight hours, with occasional "posturals;" that she not climb; and that she have only moderate exposure to pulmonary irritants and no exposure to chemicals.  (Id. at 98-99.)   Added to the hypothetical is the limitation of being required to follow and understand only simple instructions, with only occasional contact with the general public, co-workers and supervisors.   (Id. at 99.)

12

The ALJ wanted to know whether there are any jobs available to such a person. (Id.) The VE answered that this hypothetical person could be a sedentary general office clerk or an assembler. (Id. at 99-100.) These jobs would be precluded, however, by the individual being off-task 10% of the day for physical symptoms related to asthma, or because of cognitive-based limitations, falling asleep, or missing work approximately three times a month. (Id. at 100-01.) The ALJ then concluded the hearing but held the record open to allow for the collection of additional information, including psychological testing. (Id. at 105.)

## C.    Psychological Testing

In November 2010, psychologist Dr. Michael Stone evaluated Clanton's mental status. (Id. at 652.) Dr. Stone administered the Wechsler Adult Intelligence Scale-IV (an adult IQ test) and measured Clanton's IQ at 79, which places her at the eighth percentile. Clanton functions at the equivalent of a sixth-grade level, despite having graduated from high school. (Id. at 656.) A second test, the Wide Range Achievement Test, placed Clanton in the fifth to eighth percentile. (Id. at 653.) Further, Dr. Stone found her to be mildly depressed and her test results indicative of an "adjustment disorder, borderline intellectual functioning, and medical problems." (Id. at 654, 657.) He found her unable to manage funds on her own behalf. (Id.) He found her ability to understand, remember, and carry out simple instructions to be mildly affected by her impairment and found her ability to understand, remember, and carry out complex work-related decisions to be moderately affected by her impairment. (Id. at 658.) He opined, however, that her impairment did not affect

13

her ability to "interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting."  (Id. at 659.)

## D.    The Second ALJ Hearing

The ALJ held a second hearing on April 15, 2011.  (Id. at 16.)  Clanton testified again as to her daily medication needs.  She explained that she uses an inhaler pump twice a day, every day, although four or five times a week she finds that she needs to use it more often.  (Id. at 21.)  On days when she uses her inhaler more than twice a day, she also uses her nebulizer.  (Id.)  Clanton also testified that she no longer lives with her mother and that she has been trying to improve herself by taking classes, although she feels her poor memory and sleepiness interfere with her success in these classes.  (Id. at 22-23.)

Dr. Freeman testified again, this time having had the benefit of a more complete examination of Clanton's medical records.  He opined that the medical records reflect episodes of deterioration in breathing due to lung infections or pneumonia, although they also reflect treatment for asthma.  (Id. at 25.) Dr. Freeman focused on Clanton's May 2010 hospitalization, at which time Clanton admitted to marijuana use at least once, and an x-ray taken during that stay indicating the presence of "haziopacity," which he impliedly attributed to the presence of marijuana in Clanton's lungs.  (Id. at 25.)  Her pulmonary function study, Dr. Freeman felt, showed "only very minimal obstructive disease with normal or possibly slightly elevated [carbon dioxide] diffusion when corrected."  (Id. at 25.) He also noted some heart problems:  left atrial enlargement, left ventricular

hypertrophy, and possible early right ventricular hypertrophy. (Id.) The data, he concluded, is "consistent with recurrent attacks of respiratory distress that actually are probably marijuana-induced as best one can determine . . . [because] virtually every one of them is associated with significant levels of pulmonary infiltration which would interpret as being pneumonia but are probably . . . marijuana." (Id. at 25-26.) He drew a distinction between "broncho-spastic" asthma and "acute infection." (Id. at 32.) He also found her to have depression and a learning disorder or other mental impairment. (Id. at 26.) He found, in sum, that she possibly could equal the listing but that treatment non-compliance likely was the reason behind her frequent attacks. (Id. at 27.) He believed that Clanton would have fewer asthma attacks if she stopped using marijuana. (Id.) He found Clanton capable of standing for six to eight hours a day and walking up to two hours a day, although her work environment needed to be "respiratorily clean." (Id. at 27-28.) Clanton's attorney asked Dr. Freeman whether it is possible to inhale second-hand marijuana smoke and still test positive on a toxicology screen. (Id. at 28.) Dr. Freeman answered that a positive result was theoretically possible. (Id.)

The ALJ questioned Clanton on the issue of compliance with medication, given that the listing for asthma requires the presence of a prolonged attack "despite prescribed treatment." *See* 20 C.F.R. § 404, Subpt. P, App. 1 §§ 3.00C, 3.03B. The ALJ took note of an instance when Clanton failed to fill a prescription for Prednisone after she left it behind in the St. Bernard Hospital emergency room. (A.R. 41.) Clanton explained that she had lacked a state medical card at that time, thus making

15

it impossible for her to fill the prescription. (Id. at 41-42.) Clanton denied smoking marijuana or being told that she had tested positive for marijuana use. (Id. at 30.) She did admit to "hanging out" with people who smoked marijuana and said that marijuana can get "into your system" through second-hand exposure. (Id.)

Finally, the ALJ heard testimony from Margaret Ford, a VE. This time, the VE considered the following hypothetical: an individual of Clanton's age, education, and work experience who could do the "entire universe of work" with the exception that she lift no more than 10 pounds occasionally and 5 pounds frequently; that she stand and walk six out of eight hours but is restricted to walking no more than two hours a day; that she sit six out of eight hours, with occasional "posturals;" and that she not climb. (Id. at 47.) Added to that hypothetical is a moderate impairment in concentration and pace such that the individual is able to complete only simple tasks and follow simple instructions. (Id. at 47-48.) The VE stated that jobs meeting this hypothetical do exist, including assembler, bench hand, and preparer. (Id. at 48.) Frequent hospitalizations and absences from work—two to four days per month—would however preclude these jobs, as would being "off-task" for 15% of the workday. (Id. at 49.)

## E.    The ALJ's Decision

In evaluating Clanton's claim, the ALJ applied the five-step sequential inquiry for determining a disability, which required him to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the

[Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If at step three of this framework (steps one and two having been answered in the affirmative), the ALJ finds that the claimant has a severe impairment that does not meet one of the impairments listed in Appendix 1, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). A claimant's residual functional capacity ("RFC") is the quantification of what she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work. 20 C.F.R. § 404.1520(f), (g). It is the claimant's burden to prove that she has a severe impairment that prevents her from performing past relevant work. *Clifford*, 227 F.3d at 868; 42 U.S.C. § 423(d)(2)(A).

Here, at steps one and two of the analysis, the ALJ determined that Clanton has not engaged in substantial gainful activity since the application date of March 27, 2009, and that she suffers from three severe impairments: asthma, morbid obesity, and depression. (A.R. 115.)

At step three, the ALJ declined to find that Clanton has an impairment or combination of impairments that meet or equal one of the listed impairments in 20 C.F.R. § 404, Subpart P., Appendix 1. (Id.) He determined that Clanton's asthma

17

does not meet the specific criteria of Listing 3.03(B) because "the hospitalizations in March through April 2009 were not bronchospastic pneumonia, but infectious community acquired pneumonia. Subtracting the hospitalizations for infectious pneumonia, the required level of physician interventions is not present." (Id. at 115-16.) Nor did the ALJ find Clanton's depressive disorder to meet or medically equal the criteria of Listing 12.04 (affective disorder) because Clanton does not take any medication for depression or receive any type of formal mental health treatment. (Id. at 116.)

At step four, the ALJ determined that Clanton has the RFC to perform in the workforce, subject to the following limitations:

> she is limited to lifting and carrying 10 pounds occasionally, five pounds frequently, standing and walking 2 hours out of an eight hour workday, with maximum standing limited to 15 minutes at a time; sitting six hours of an eight hour workday; occasional positional movements; no climbing; only moderate exposure to pulmonary irritants; no chemicals; understanding, remembering, and following simple instructions, and only occasional contact with the general public, co-workers, and supervisors.

(Id. at 116.) In making this determination, the ALJ reviewed many of Clanton's hospitalizations and concluded that, as per Dr. Freeman, they were for "community acquired pneumonia," as opposed to "bronchospastic pneumonia." (Id. at 117.) He noted that between hospitalizations, Clanton's level of asthma severity was "relatively mild," and that she had "normal pulmonary function testing" in July 2009. (Id. at 118.) The ALJ found incriminating the evidence of Clanton having smoked marijuana at least once, although he did not accept Dr. Freeman's contention that

Clanton had recurrent marijuana-induced asthma attacks. (Id. at 118, 122.) Clanton's denial that she ever smoked marijuana was irksome to the ALJ in the face of evidence to the contrary and indicated to him that Clanton has a greater ability to manage her daily symptoms than she claims. (Id. at 120.) He noted there were occasions when Clanton was non-compliant with her medications, although he did not hold this against her given her financial and transportation limitations. (Id. at 120.) The ALJ also took note of Clanton's morbid obesity. (Id. at 119, 122.) In terms of daily activities and socialization, the ALJ found Clanton to have only mild limitations. For instance, she is able to use public transportation, she takes care of her young daughter, she takes college classes, and she paid proper attention at the hearing and answered questions appropriately. (Id. at 120-21.)

Finally, at step five, the ALJ found that Clanton's RFC allows her to work as a general office clerk or an assembler. (Id. at 122-23.) Accordingly, the ALJ concluded that Clanton is not under a disability as defined by the Social Security Act and denied her application for benefits. (Id.)

## Analysis

In her motion for summary judgment, Clanton challenges the ALJ's decision in three respects. First, she argues that the ALJ improperly discounted many of her hospitalizations as not being asthma "attacks" and, in so doing, incorrectly failed to find her disabled at step three. Second, she argues at step five that the ALJ erroneously concluded that she has the RFC to perform full-time work. Finally, she

argues that evidence regarding her marijuana smoking was errant and speculative and should not have been a factor in the ALJ's decision.

This court confines its review to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)), and examines whether the ALJ's decision is supported by substantial evidence, *Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. The court must affirm the ALJ's decision if reasonable minds could differ regarding whether the claimant is disabled. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). But remand is warranted if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele*, 290 F.3d at 940, or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotations omitted).

## A.    The ALJ's Step Three Analysis

This court turns first to Clanton's contention that the ALJ should have found her disabled at step three pursuant to Listing 3.03B (asthma). Clanton maintains that she satisfied this listing because, despite efforts at home with her nebulizer and

inhaler, she suffered at least six asthma attacks requiring physician intervention within a 12-month period. The Commissioner, on the other hand, argues that Clanton did not have the requisite number of attacks to satisfy the listing because Listing 3.00C (episodic respiratory disease) separates out bronchitis and pneumonia from asthma, thereby justifying the ALJ's decision to exclude episodes in which bronchitis or pneumonia also were present. Alternatively, the Commissioner argues that the ALJ properly disregarded several visits (independent of the pneumonia issue) because of Clanton's failure to follow a medical regimen: several times she either lost or forgot her inhaler, and another time she neglected to fill her Prednisone prescription.

Listing 3.03B must be read in conjunction with Listing 3.00C as each cross-references the other. Listing 3.00C explains that "[w]hen a respiratory impairment is episodic in nature, as can occur with exacerbations of asthma . . . the frequency and intensity of episodes that occur despite prescribed treatment are the major criteria for determining the level of impairment." *See* 20 § C.F.R. 404, Subpt. P, App. 1 § 3.00C. Stated more simply, three criteria are necessary for determining the degree of impairment from an episodic respiratory disorder such as asthma: (1) the frequency of the episodes; (2) the intensity of the episodes; and (3) whether the episodes occurred despite prescribed treatment. *Id.* As for asthma specifically, the frequency component of the listing is satisfied only if a claimant can show that she suffered six attacks within a year's time (meaning 12 consecutive months), bearing in mind that "[e]ach in-patient hospitalization[ ] for longer than 24 hours for control of

21

asthma counts as two attacks . . . ." *Id.* § 3.03B. The intensity component is satisfied if the episode is of sufficient severity to be considered an "attack," defined as a "prolonged symptomatic episode[ ] lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." *Id.* § 3.00C. Finally, the episode must have occurred "in spite of prescribed treatment," such as regular home use of nebulizers and inhalers. *Id.* § 3.03B. As it is Clanton's burden of proof to show that the requirements of the listing have been met, *see Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006), documentation for these exacerbations should include:

> available hospital, emergency facility and/or physician records indicating the dates of treatment; clinical and laboratory findings on presentation, such as the results of spirometry and arterial blood gas studies (ABGS); the treatment administered; the time period required for treatment; and the clinical response. . . . For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

20 C.F.R. § 404, Subpt. P, App. 1 § 3.00C.

A great deal of time during the two administrative hearings was dedicated to establishing the presence or absence of these three factors, with special focus on the issue of what constitutes an asthma "attack." The ALJ, Dr. Freeman, and Clanton's attorney discussed at length whether Clanton's hospitalizations could properly be viewed as asthma exacerbations or something else, with distinctions made on the presence of wheezing, on the difference between bronchospastic pneumonia and community acquired/infectious pneumonia, and on the ability to move air in and out

the lungs. Ultimately, the ALJ drew a distinction between "bronchospastic pneumonia" and "infectious community acquired pneumonia" in concluding that none of Clanton's hospitalizations in March and April 2009 would be counted toward the listing, stating:

> I determine the hospitalizations in March through April 2009 were not bronchospastic pneumonia, but infectious community acquired pneumonia. Subtracting the hospitalizations for infectious pneumonia, the required level of physician interventions is not present. Although pneumonia hospitalizations are allowed under section 3.04B (cystic fibrosis), the claimant does not have cystic fibrosis needed for that section.

(A.R. 116.) The ALJ did not explain why one type of pneumonia (bronchospastic) seemingly would satisfy the listing while the other (infectious community-acquired) would not, or why it is even necessary to try to disentangle pneumonia of any kind from asthma exacerbation when determining the number of episodes experienced within a calendar year. Nor did he analyze other components of the listing; for instance, whether Clanton suffered asthma attacks of sufficient intensity to satisfy the listing, or whether the episodes occurred despite prescribed treatment.

Turning to the language of the listing itself, Listing 3.00C defines "attack" as a "prolonged symptomatic" episode requiring "intensive treatment," such as intravenous or inhalational bronchodilators or antibiotics. Nowhere in Listings 3.00C or 3.03B is an asthma attack further defined, or discounted, by either its triggers or by medical conditions that may occur in tandem. Rather, it is the criteria set forth in Listing 3.00C (and cross-referenced in Listing 3.03B) that establish the parameters of an "attack" for purposes of the listing, namely a prolonged

23

symptomatic episode requiring intensive treatment. While the Commissioner argues that the explanatory notes to Listing 3.00C make clear that the listings treat asthma attacks and episodes of bronchitis or pneumonia as separate and distinct problems, this court disagrees. Certainly bronchitis, pneumonia and asthma are all distinct conditions, but Listings 3.00C and 3.03B are devoid of language characterizing different types of pneumonia or bronchitis as either antagonistic or, conversely, conducive to the finding of an actual asthma "attack." Furthermore, listing 3.00C finds common ground among these conditions by subjecting episodes of bronchitis or pneumonia to the same "attack" definition as asthma (meaning, once again, a prolonged symptomatic episode, etc.). Consequently, this court declines to accept a distinction between asthma exacerbation as a solo condition and asthma exacerbation-*cum*-pneumonia/bronchitis when the listings themselves make no such differential.

In *Grant v. Astrue*, No. CV 11-0554, 2011 WL 5075653 (C.D. Cal. Oct. 24, 2011), virtually the same issue was addressed: whether asthma exacerbated by colds or bronchitis should be treated differently from asthma triggered by other environmental irritants for purposes of satisfying the listing for asthma. In concluding that the two cannot be treated differently, the court in *Grant* noted that nowhere in the relevant listings "is an 'asthma attack' defined by what triggers it. Nor is it clear that the two pulmonary diseases asthma and bronchitis are not interrelated." *Id.* at *4; s*ee also Russo v. Astrue*, No. CV 09-9322, 2010 WL 4916628 (C.D. Cal. Dec. 1, 2010) (finding that the ALJ's attempt to separate claimant's

hospitalizations for asthma from those for tachycardia was in error where medical evidence indicated that the two conditions were interrelated).

Accordingly, the court finds that the ALJ had no legal basis for discounting all of Clanton's emergency room visits and hospitalizations in March and April of 2009 on the sole basis that some or all of them involved pneumonia or bronchitis symptoms. Without the requisite logical bridge linking the language of the listings with the ALJ's determination on this point, a remand on this issue is appropriate. *See Craft*, 539 F.3d at 673 (remand warranted where ALJ failed to provide logical bridge between evidence and conclusion that claimant is not disabled). This is not to say, however, that this court finds Clanton to have met the relevant listing. This court is merely stating that the ALJ erred in his analysis of what constitutes an asthma attack. The step three analysis must stand on firmer ground than the conclusion that "infectious community acquired pneumonia" negates the validity of Clanton's asthma symptoms. On remand, the ALJ will need to re-address the components of Listings 3.00C and 3.03B as set forth above: frequency, intensity, and the need for medical involvement despite prescribed treatment.

To the extent the ALJ again does not believe that hospitalizations involving community-acquired pneumonia should be counted toward the listing, he should explain in greater detail why and do so in a manner consistent with the listing and the medical record. Furthermore, in the event the ALJ feels that Clanton failed to meet the listing for asthma because of medical non-compliance, he needs to expressly say so. The Commissioner raises on appeal the argument that the ALJ had an

25

alternative basis for disqualifying a number of Clanton's hospitalizations and hospital visits at step three—her repeated failure to have an inhaler on hand and to fill medical prescriptions for Prednisone and Levaquin.   However, any discussion of non-compliance took place during the step four analysis and was not specifically mentioned as a basis for rejecting Clanton's claim at step three.   This court therefore cannot address this argument on appeal as the *Chenery* doctrine forbids the Commissioner from advancing arguments that the ALJ himself did not embrace. *See Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012); *Chenery*, 318 U.S. at 87-88. Certainly, however, the issue of whether Clanton was compliant with her home medications prior to arriving at the hospital will be relevant on remand.

**B.    The ALJ's Step Five Analysis.**

Next, Clanton argues that the ALJ erred at step five in finding that she has the RFC to perform full-time work.   In support of this position, Clanton makes five sub-arguments:   (1) that the ALJ improperly adopted a less stringent level of pulmonary irritant exposure when establishing the vocational guidelines; (2) that a hypothetical incorporating a more stringent level of pulmonary irritant exposure was never properly posed to the VE; (3) that the ALJ discounted the treating physician rule and the testimony of Dr. Wadke and Dr. Stone when determining that Clanton has the ability to engage in full-time work, even at the sedentary level; (4) that the ALJ improperly discounted the testimony of Clanton's mother; and (5) that the ALJ failed to consider the combined severity of Clanton's asthma and morbid obesity on her ability to sustain full-time work.

26

SSR 96-8p instructs that:

> [t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case were considered and resolved.

1996 WL 374184, at *7 (July 2, 1996). The RFC is then assessed along with the claimant's age, education, and work experience to ascertain whether the claimant can "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v).

First, this court addresses whether the ALJ impermissibly accepted the less-restrictive guidelines suggested by Dr. Freeman at the first hearing, as opposed to the more restrictive ones discussed at the second hearing. To recap, at the first hearing, Dr. Freeman testified that, "ideally, she would be limited to low or moderate levels of respiratory irritants but . . . with no more than minimal exposure to chemical irritants." (A.R. 74.) At the second hearing, Dr. Freeman opined that Clanton should have "no exposure to anything more than low levels of respiratory irritants." (Id. at 28.) Despite Dr. Freeman's change in his testimony, from low/moderate to low, the ALJ concluded that Clanton is able to handle a moderate exposure to pulmonary irritants. (Id. at 116.) In making this ruling, the ALJ remarked that while Dr. Freeman placed different limitations at each hearing, he found the limitations identified at the first hearing to be more accurate. (Id. at 122.)

He explained that he found some of Dr. Freeman's testimony at the second hearing to be speculative, and further that Clanton's history of smoking indicated an ability to be around some amount of respiratory irritants. (Id. at 122.) Although Clanton denied smoking marijuana or cigarettes at the hearing, the medical record shows that she smoked marijuana one month prior to her May 2010 hospitalization. (Id. at 615.) The record also reflects medical staff observations that Clanton smelled like cigarette smoke. (Id. at 327.) The ALJ was entitled to find Clanton's denial of smoking to be unbelievable in light of evidence to the contrary, and consequently to conclude that she is able to handle a moderate level of pulmonary irritants. *See Sims v. Barnhart*, 442 F3d. 536, 538 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). As such, the ALJ's ruling here is reasonable and supported by the record and will not be disturbed. *See Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004).

Second, Clanton argues that the ALJ should have posed a hypothetical to the VE that included the modified limitation of only low levels of respiratory irritants, as opposed to a hypothetical incorporating moderate levels of respiratory irritants. This court disagrees. When an ALJ relies on a VE's testimony, as was the case here, "the ALJ will pose a series of hypothetical questions that describe the claimant's conditions and limitations, and the VE will testify to the number of jobs that the claimant can perform based on those limitations." *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009). The ALJ's hypothetical questions must incorporate only those

28

limitations supported by medical evidence in the record. *See Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004); *Young v. Barnhart,* 362 F.3d 995, 1003 (7th Cir. 2004). Further, "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt,* 496 F.3d at 846. Here, the ALJ's decision to incorporate Dr. Freeman's testimony from the first hearing was based on his assessment that Dr. Freeman's testimony at the second hearing was speculative. (A.R. 122.) Likewise, the ALJ made clear that he did not find Clanton's symptoms to be as severe as she claims due to evidence in the record showing that she smoked marijuana and possibly cigarettes. (Id. at 119-20.) Thus, the ALJ's hypothetical question properly focused only on those limitations he found both credible and supported by the medical evidence. *See Steele,* 290 F.3d at 942.

Third, Clanton argues that the ALJ erred in discounting the testimony of her mother, Taunja Guillebeaux. Guillebeaux testified briefly that her daughter's asthma "was bad" and that Clanton falls asleep in front of the television. (A.R. 104.) Guillebeaux described in generalized terms what happens when her daughter gets an asthma attack. (Id.) The ALJ found the testimony unhelpful in that it "fails to shed new light on the situation." (Id. at 120.) This court cannot reweigh this evidence.

Fourth**,** Clanton argues that her documented medical impairments and symptoms are inconsistent with full-time work, even at a sedentary level. In support of this argument, Clanton points to the Pulmonary RFC questionnaire completed by Dr. Wadke, whom Clanton refers to as her treating physician.

29

Clanton argues that the questionnaire shows she has attacks every three to four months for three to five days at a time and that this is direct proof of her inability to do work of any kind. (A.R. 718.) The ALJ, however, rejected Dr. Wadke's assessment as not supported by the medical record. (Id. at 121.) Dr. Wadke, he noted, only examined Clanton once and the examination occurred almost four months prior to his completion of the form (not five, as the ALJ states). (Id.) The ALJ also found troubling the fact that Dr. Wadke refers to an attached pulmonary function test that was not, in fact, attached to the assessment. (Id.) Further, he felt that Clanton approached Dr. Wadke for the sole purpose of having a disability form filled out, that she was not under any breathing distress at the time of her examination, that she overstated the severity of her condition, and that an outpatient spirometry done in September 2010 (one month after Dr. Wadke's examination) showed essentially normal results except for a borderline ventilatory defect. (Id.)

The court finds that the ALJ's reasons for rejecting Dr. Wadke's assessment are well-supported by the record and thus not subject to reversal. *See Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (noting that an ALJ may reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations). With only one report in the record identified as involving an appointment with Clanton, Dr. Wadke cannot be viewed as a "treating physician" whose opinion is entitled to controlling weight. A treating physician is a doctor who has been able to observe a claimant over an extended period of time, who specializes

30

in treating the claimant's condition, and who has likely performed diagnostic tests. *See* 20 C.F.R. § 404.1527(d)(2)(i)-(ii). A doctor who has examined a patient only once, for purposes of completing a form, is not entitled to this more deferential status. *See Simila*, 573 F.3d at 514 (finding that a physician who examined claimant only once is not a treating source and thus his opinion is not entitled to controlling weight); 20 C.F.R. § 404.1502.

Clanton similarly argues that Dr. Stone's testing and assessment support a disability ruling. Dr. Stone found Clanton to have the "history, symptoms, and signs . . . of [an] adjustment disorder [with depression], borderline intellectual functioning, and medical problems;" rated her prognosis as "guarded;" and found her "unable to manage funds/benefits [o]n her own behalf." (A.R. 657.) The ALJ, however, noted that Dr. Stone also "indicated claimant has a mild limitation in understanding, remembering, and carrying out and making judgment [sic] on simple instructions, as well as a moderate limitation regarding complex instructions, and no social problems." (Id. at 121.) A "mild" limitation, according to Dr. Stone's own form, involves "a slight limitation . . . but the individual can generally function well." (Id. at 658.) The ALJ felt these limitations were consistent with an RFC that includes "following simple instructions, and only occasional contact with the general public, co-workers, and supervisors." (Id. at 116.) This court agrees. The ALJ noted that Clanton was able to complete Dr. Stone's intellectual and achievement tests, was able to pay close attention during the hearings, paid close attention to questions asked of her, and answered questions appropriately. (Id. at 121.) He

31

found persuasive the facts that Clanton receives no mental health treatment and that none of her doctors has recommended that she pursue such treatment. (Id.) The ALJ also noted that Clanton takes care of her young daughter and attends classes at a local community college, including coding and billing, keyboarding, and math. And although she struggles academically, with math in particular, the ALJ felt this was more the result of her inadequate mathematics foundation than of her inability to maintain attention and focus. (Id. at 120.) The court finds that the ALJ's determination on this point is well supported by the record. *See Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010) (upholding ALJ's determination that claimant could perform sedentary work, despite her medical limitations, where ALJ relied upon doctor evaluations and the testimony of a VE). While reasonable minds arguably could differ on the import of Dr. Stone's report, this alone is not enough to overturn the ALJ's determination. *See Schmidt*, 496 F.3d at 842.

Fifth, Clanton argues that the ALJ failed to address the combined severity of her asthma and cognitive problems with her morbid obesity. This court disagrees. Obesity is a complicated issue within the Social Security context because it does not have its own listing. *See Social Security Ruling 02-1p*, 2002 WL 34686281, at *5. Even so, as explained in SSR 02-1p, "[o]besity . . . commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. . . . Obesity may also cause or contribute to mental impairments such as depression." (Id. at *3.) Accordingly, it is possible for an obese individual with multiple impairments, none of which meet or equal the requirements of a listing, to

32

nonetheless have a "combination of impairments . . . equivalent in severity to a listed impairment." (Id. at *5.) ALJs are therefore obligated to take obesity into consideration when determining the total impact of a claimant's impairments. *Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2001); *Clifford*, 227 F.3d at 873. This requirement is tempered, however, by the harmless error rule. Under that rule, even if it appears that an ALJ had not expressly considered a claimant's obesity, his failure to do so will be deemed harmless error where he "indirectly took obesity into account by adopting limitations suggested by physicians who were aware of or discussed [the claimant's] obesity." *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012); *see also Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

In this case, the ALJ counted morbid obesity among Clanton's severe impairments. (A.R. 115). He did not expressly discuss whether Clanton's obesity, together with other impairments, met or medically equaled a listed impairment, but he certainly was aware of Clanton's height and weight because he questioned her specifically on this topic. (Id. at 78.) Furthermore, the ALJ adopted sedentary standing and walking restrictions based on Dr. Freeman's concern that "Clanton's "level of obesity . . . would increase the oxygen demand [such that] she probably would be limited to basically sedentary exertional demands." (Id. at 122.) Finally, when assessing whether Clanton was able to handle light standing and walking as recommended by Dr. Freeman at the second hearing, the ALJ stated, "I believe the morbid obesity in combination with the asthma more appropriately limits the claimant to sedentary work." (Id. at 122.) As such, the court finds that the ALJ

33

took Clanton's obesity into account when determining the aggregate effect of her impairments and that any error on his part in failing to more expressly discuss this issue was harmless. *Prochaska*, 454 F.3d at 737.

Finally, Clanton argues that the ALJ erred in finding that she smokes marijuana and in concluding that she is able to tolerate moderate levels of respiratory irritants. She claims that a preponderance of the evidence does not support this conclusion and that it is an unjustifiably accusatory position. Clanton's argument boils down to the questions of whether the ALJ fairly rejected her testimony as not credible and whether there is evidence in the record supporting marijuana usage. Clanton loses on both grounds. As noted above, the record supports the ALJ's conclusion because the medical record contains a notation that Clanton smoked marijuana one month prior to her May 2010 hospitalization. (A.R. 615, 624.) As for the ALJ's finding that Clanton lacked credibility, this court will only overturn such an assessment where the claimant shows it is patently wrong. *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012). Given the medical record and the ALJ's explanation for his credibility findings, this court cannot say his assessment was patently wrong. (*Id*.)

**Conclusion**

For the foregoing reasons, Clanton's motion for summary judgment is granted to the extent it seeks a remand, and the Commissioner's motion for summary judgment is denied.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**